2023R00485/DHR

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : Hon. James B. Clark, III |
| v. | : Magistrate. No. 25-12100 |
| JOHN VO | : CRIMINAL COMPLAINT |

I, James J. Matt, II, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Drug Enforcement Administration, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

/s/ *James J. Matt, II* (dhr)
_____
James J. Matt, II, Special Agent
Drug Enforcement Administration

Special Agent Matt attested to this Affidavit by telephone pursuant to F.R.C.P. 4.1(B)(2)(A) on this 5th day of August, 2025.

_____
Hon. James B. Clark, III
United States Magistrate Judge

## ATTACHMENT A

(Conspiracy to Distribute and Possess with Intent to Distribute 500 Grams or More of Methamphetamine)

From at least in or around July 2024 through on or about August 4, 2025, in the District of New Jersey and elsewhere, the defendant,

**JOHN VO,**

did knowingly and intentionally conspire with others to distribute and possess with intent to distribute 500 grams and more of mixtures and substances containing a detectable amount of methamphetamine, contrary to Title 21, United States Code, Section 841(a)(1) and Section 841(b)(1)(A).

In violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

I, James J. Matt, II, am a Special Agent of the Drug Enforcement Administration (the "DEA"). The information contained in the complaint is based upon my personal knowledge, as well as information obtained from other sources, including: (a) statements made or reported by various witnesses with knowledge of relevant facts; (b) my review of publicly available information; and (c) my review of evidence, including electronic evidence, recordings, and other documents. Because this complaint is being submitted for a limited purpose, I have not set forth every fact that I know concerning this investigation. Where the contents of documents and the actions and statements of others are reported, they are reported in substance and in part, except where otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. In or around July 2024, a confidential source ("CS-1") working with the DEA met John Vo ("VO"), the defendant, and others. Law enforcement officers saw the meeting and confirmed VO's identity through various means, including car rental records and comparing VO's appearance to photographs maintained in Government databases. At the meeting, VO and the other parties discussed coordinating the shipment of a large quantity of controlled substances from the United States to a foreign country.

2. Over the course of several months, VO and CS-1 remained in periodic contact via text messages and phone calls, which CS-1 recorded, to discuss arranging large shipments of controlled substances and acquiring access to precursor chemicals used to synthesize controlled substances. While the conversations at times used coded language, the conversations unambiguously pertained to narcotics.

3. For example, in or around March 2025, CS-1 told VO that CS-1 would provide a video of "product" available from one of CS-1's associates, and VO expressed that his associates require that the product not be yellow in color. CS-1 subsequently texted VO a video that appears to depict methamphetamine purportedly available for sale for VO to review with his associate. VO describes the drugs as "nice and chunky," and subsequently conveyed that his associate also said the drugs appeared "chunky" (*i.e.*, high quality) compared to "the Korean stuff they getting." An excerpt from that text thread is shown below:



4.      In a subsequent recorded call, VO stated that his associate was requesting a "demo" before placing an order, whereas VO wanted to proceed directly to an initial shipment through CS-1's organization. VO conveyed to CS-1 that VO told his associate, "when it gets there, I shoot you one, you do whatever the f[…] you do, you test it, flip it, smoke it, I don't care, and then give me an answer."

5.      In other recorded telephone conversations, VO discussed passing "files" to CS-1, which, based on my training and experience, the context of the conversation, and the fact that VO on one occasion referred to the "files" being in "cash," "files" in this context is likely a coded reference to money that would be used to pay CS-1's organization for the controlled substances.

6.      In or around June 2025, VO met with CS-1 in New Jersey, where they agreed that VO would pay $120,000 in exchange for approximately 100 kilograms of methamphetamine, which CS-1's purported organization could provide and transport to VO's coconspirators in a foreign country via the United States. In substance and in part, as reflected in a recording of the conversation, VO discussed providing the "files" to CS-1 in exchange for "100"; how pricing could change for future; means of making payment; how VO's coconspirators are currently receiving low-quality product (*i.e,*, drugs); different trafficking routes; their respective

expected profits; and how VO would send an associate to the foreign country to receive the shipment.

7.  VO arranged to make an initial $50,000 payment by directing an associate to drop off cash with an associate of CS-1, *i.e.*, another confidential source ("CS-2"). On or about June 18, 2025, VO's associate completed the $50,000 drop-off to CS-2, constituting partial payment for the methamphetamine.

8.  VO and CS-2 next arranged for VO to pay the remaining $70,000 balance. That payment was made in cash to CS-3 on or about July 8, 2025, through a different associate of VO.